IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BONITA STEWART, | : | Case No. 1:17-cv-84 |
| Plaintiff, | : | Judge Susan J. Dlott |
| v. | : | **ORDER GRANTING REMAINING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| WARREN COUNTY BOARD OF COMMISSIONERS, *et al.*, | : | |
| Defendants. | : | |

This matter is before the Court for consideration of the Motion for Summary Judgment of Defendants Solutions Community Counseling and Recovery Centers, Inc. ("Solutions"), Jon Randol, and Jenny Epling (Doc. 83). Plaintiff Bonita Stewart opposes Defendants' Motion (Doc. 86). For the reasons that follow, the Defendants' Motion for Summary Judgment (Doc. 83) will be **GRANTED** as to Plaintiff's federal claim. The Court will decline to exercise supplemental jurisdiction over the Plaintiff's state law claims, and those claims will be **DISMISSED WITHOUT PREJUDICE**.

I. BACKGROUND

A. Facts

The undisputed facts in this case are tragic. Sometime in March 2013, Justin Stewart[1] moved home to southern Ohio to join his father's insurance business and work alongside his brother. (Jos. Stewart Dep., Doc. 80 at PageID 1290–91.) Although Justin had been academically successful (earning both a bachelor's and a master's degree) and socially involved

---

[1] The plaintiff in this case and two other witnesses share the surname "Stewart." In the interest of clarity, the Court will refer to the decedent in this matter as "Justin."

1

throughout high school and college, he began to withdraw from others and seemed to obsess over perceived irregularities in the family business. (*Id.* at PageID 1291.) He argued with his co-workers, and his disruptive behavior at work escalated to the point that his father had to ask him to leave the agency "until he could get his act together." (*Id.* at PageID 1291.) His father urged him to seek mental health treatment "to control the arguing." (*Id.* at PageID 1292.) Justin was hired by two other insurance agencies but fired from both because he continued to engage in similar behavior. (Doc. 81 at PageID 1338–39.)

In November 2014, Justin broke into his parents' house while they were out of town and severely vandalized his father's car with a hammer. (B. Stewart Dep., Doc. 79 at PageID 1202–03.) He called his mother to tell her what he had done. (*Id.* at PageID 1203.) His parents returned home shortly thereafter, and—after seeing the extent of the damage to the car—contacted police. (*Id.* at PageID 1204.) Justin's parents were increasingly worried about his mental health and "were just concerned that this might lead to something else." (*Id.*)

Knowing the police were at his parents' home, Justin returned to the property. He willingly acknowledged that he had a gun in his car, and he was charged with improper handling of a firearm in a motor vehicle. (Doc. 73-1 at PageID 787, 803.) Justin was arrested, but his parents posted his bail. (Doc. 79 at PageID 1206–07.) Ultimately, Justin pled guilty to the charge, and the Court sentenced him to probation with required anger management counseling. (*Id.* at PageID 1209.) Justin attended some of the counseling sessions and had previously been prescribed Adderall to help him focus, but he did not really engage with the counselors. (*Id.* at PageID 1209–11; Doc. 73-1 at PageID 806–07.) Justin told his father he did not need mental health treatment, and he was not receptive to his father's efforts encouraging him to get help. (Doc. 80 at PageID 1295.)

In May 2015, Justin came to his parents' home yelling and swearing, and he threw furniture off a balcony. (*Id.*) Again, Justin's parents called police because they "believed the system could help him." (*Id.*) Justin was arrested again, incarcerated for approximately three months, and then placed on probation. (Doc. 79 at PageID 1225–26.) Justin continued to be hyper focused on what he perceived to be irregularities in the family business, and he continued to deny the need for mental health treatment. (*Id.* at PageID 1227; Doc. 73-1 at PageID 787–90.)

In April 2016, after Justin refused to meet with his probation officer, Amy Hogg,[2] Hogg filed a probation violation, and a warrant was issued for Justin's arrest. (Hogg Dep., Doc. 70 at PageID 429.) Justin was arrested and incarcerated at the Warren County Jail. (Doc. 79 at PageID 1228.) Hogg met Justin at the jail, but he was angry and paranoid. He would ask her a question and then say her name repeatedly while she tried to answer. (Doc. 70 at PageID 430–31.) However, he was not labeled "mentally ill" at the jail. (*Id.* at PageID 433.)

Warren County Common Pleas Judge Robert Peeler, who presided over Justin's probation violation and related charges, ordered that Justin undergo a competency assessment, but Justin refused to cooperate with the evaluation. (Doc. 70-1 at PageID 490.) Judge Peeler ordered another evaluation, and Justin was sent to Summit Behavioral Health ("Summit") for a 20-day competency evaluation in June 2016. (*Id.* at PageID 445, 448.) According to his discharge summary, Justin denied any history of suicide attempts or self-harm, and he was not diagnosed with a psychiatric illness or started on psychotropic medication. (Doc. 70-1 at PageID 492.) Summit documents described Justin as "antagonizing," "condescending," "unpleasant," "very narcissistic" and stated he "agitated many of the patients" to the point that "other patients

---

[2] At the time of her deposition, she was known as Amy Bidinger.

on the unit actually wrote a petition to get him taken off the unit because he was causing so many problems." (Doc. 70-1 at PageID 493.) Summit ultimately diagnosed Justin with narcissistic personality disorder as of June 23, 2016. (Doc. 70 at PageID 449; Doc. 70-1 at PageID 492–93.)

On July 5, 2019, Judge Peeler ordered that Dr. Kara Marciani do a psychological evaluation of Justin at the Warren County Jail. (Doc. 70-1 at PageID 495.) Dr. Marciani interviewed Justin for approximately two and one-half hours, administered the Minnesota Multiphasic Personality Inventory-2 and the Violence Risk Appraisal Guide-Revised ("VRAG-R"), interviewed others who knew Justin, reviewed prior psychiatric evaluations and correspondence, reviewed the incident report from the Maineville Police Department, and submitted her report on July 26, 2016. (Doc. 73-1 at PageID 795–808.) Dr. Marciani concluded:

> [Justin's] symptom picture belies the presence of serious and chronic illness for which a diagnosis of a Delusional Disorder, specifically Delusional Disorder, Persecutory Type is appropriate. The aforementioned diagnosis is assigned to individuals who exhibit delusional thought content for one month or longer. The central theme of the delusion involves the individual's belief that he/she is being conspired against, spied on, maliciously maligned, harassed, or obstructed in the pursuit of long-term goals. The individual's functioning nevertheless is not obviously impaired, apart from the direct impact of the delusion(s) or its ramifications, and their behavior is not obviously bizarre or odd.
> * * *
> The persecutory nature of [Justin's] delusions is of marked concern, particularly given that it has spawned a persistent pattern of erratic, threatening, and intimidating behavior. It further is of concern given the result of the VRAG-R, which suggested that he falls within the low end of the medium risk category for violent recidivism. [Justin] is without any prior history of violent or aggressive behavior toward others prior to the development of his psychiatric symptoms. It subsequently is imperative that he engage in treatment to address his symptoms as a means of reducing his future risk for engaging in behavior that is harmful to others.
> In light of the present findings, it is the undersigned's opinion with reasonable psychological certainty that [Justin] suffers from a serious and chronic mental illness for which treatment is warranted.

> He in fact would meet the criteria to be deemed a mental ill person subject to Court order. The nature and the severity of [Justin's] symptoms, and the potential threat of harm he poses to others, necessitates treatment in a controlled environment. The least restrictive treatment environment for his individual treatment needs, and public safety, subsequently is hospital-based treatment. It therefore respectfully is recommended that he undergo a period of inpatient treatment at a Regional Psychiatric Hospital, such as Summit Behavioral Healthcare.

(Doc. 73-1 at PageID 808–09.) Dr. Marciani further noted that Justin "is expected to continue to be a reluctant, if not unwilling, participant in treatment; particularly any treatment that contains a pharmacological component." (*Id.* at PageID 809.)

Judge Peeler, based on Dr. Marciani's report, told Justin on August 8, 2016 that he was suffering from paranoia, recommended inpatient hospitalization and ordered Justin to be screened for possible placement at Summit. (Doc. 79 at PageID 1242–43; Doc. 70-1 at PageID 497.) Justin was remanded to the custody of the Warren County Sheriff until he could be transported to the appropriate placement. (Doc. 70-1 at PageID 497.)

The Warren County Jail contracts with Defendant Solutions, a non-profit corporation, for inmate mental health assessments and screening. (Randol Dep., Doc. 73 at PageID 709–10, 715–16.) As part of that contract, Defendant Jon Randol provided inmate assessments at the Warren County Jail. (*Id.* at PageID 709–10.) In that role, Randol met Justin twice. Once, after Justin refused a 12-day screening with Defendant Jenny Epling, Randol asked Justin if he would let Randol do a 12-day screening, but Justin declined. (Doc. 73 at PageID 739.) According to Randol, "Justin was adamant about not needing mental health treatment or wanting to be screened." (*Id.*) Randol met with Justin a second time because Judge Peeler had asked that Justin be assessed to see if he met the criteria for involuntary hospitalization. (*Id.* at PageID 742.) Prior to the second meeting, Randol reviewed Justin's prior psychological assessment for

5

diagnosis and recommendation, but he did not review the entire document. (*Id.* at PageID 743.) Randol was aware that other inmates had threatened Justin because he was "kind of condescending and perhaps irritating to them" so Justin was moved to administrative segregation to protect him from others. (*Id.* at PageID 744.) Justin appeared physically healthy, and he denied having any thoughts of harming himself or others. (*Id.* at PageID 746, 749.) He repeatedly stated that he did not need mental health care and he just wanted to be released from jail so he could apply for certain jobs. (*Id.* at PageID 746–47.)

On August 12, 2016, Colleen Chamberlain from Defendant Solutions emailed Judge Peeler. She informed him that Defendant Jon Randol, Solutions' crisis team supervisor, met with Justin at the Warren County Jail earlier that day for approximately 45 minutes and had reviewed Dr. Marciani's report. (Doc. 73-1 at PageID 815.) Chamberlain stated that Randol had evaluated Justin for "pink slip" criteria[3] and concluded that Justin "did not meet criteria for suicidality, homicidality, or decompensation to the point of requiring hospitalization." (*Id.*) Chamberlain further noted that "non-emergent forensic cases have a lengthy wait time as the bed space at Summit is at a premium." (*Id.*) Thus, Solutions recommended outpatient therapy services and possible placement in the SPMI (severely and persistently mentally ill) program so that he could receive case management services, if the provider agency so recommended. (*Id.*) Judge Peeler responded immediately that:

> If, after observing [Justin] and conferring with his Probation Officer, I did not think hospitalization was necessary, I would not have pursued that route. However[,] there isn't much I can do under the circumstances. We will investigate options and consult with Solutions.

---

[3] "Pink slip" criteria refer to the statutory requirements for imposing an involuntary 72-hour psychiatric hold. (Doc. 73 at PageID 731.) If an inmate meets "pink slip" criteria, the assessing professional maintains the inmate until a bed is arranged at Summit, a secure facility. (*Id.* at PageID 738.)

(*Id.*)

Because Hogg was unable to get Justin placed at Summit, she contacted different mental health agencies to try to find a place for Justin to be treated, including a possible placement at the Lindner Center. (Doc. 70 at PageID 438; Doc. 70-1 at PageID 499; Doc. 79 at PageID 1245–46.) On August 17, 2016, Hogg proposed that Justin receive short-term inpatient treatment at the Lindner Center and then reside with his uncle and receive monthly outpatient treatment at Solutions. (Doc. 70-1 at PageID 499.) Judge Peeler agreed and suggested they schedule a Court date for Justin's release once a "viable option" is available. (*Id.*)

Defendant Jenny Epling, a Licensed Professional Counselor and also a Solutions employee, served as the boundary spanner at the Warren County Jail. (Randol Dep., Doc. 73 at PageID 725.) A "boundary spanner" meets daily with the 10-minute and 20-minute suicide watch inmates to determine whether or not they should stay on suicide watch and also performs general one-page mental health screenings for inmates who have been in jail for between one and twelve days ("12-day assessments"). (*Id.*) If, during a 12-day assessment, an inmate expresses willingness to have one-on-one psychological treatment while he is in jail, the boundary spanner refers that inmate to the jail therapy employee. (*Id.* at PageID 729.) A boundary spanner also performs weekly checks on inmates in administrative segregation. Epling checked inmates' mood, affect, and functioning. (Epling Dep., Doc. 72 at PageID 597–601.) She asked inmates if they wanted to talk to mental health staff, and she made them respond and show her their face so she could check their status and determine whether further intervention was necessary. (*Id.* at PageID 603; Doc. 74 at PageID 849.) She also examined their hygiene, cleanliness of cell, and manner of speech. (Doc. 72 at PageID 657.) In addition, a kiosk is available through which

7

inmates (whether or not on administrative segregation) can request to see a mental health provider at any time. (Doc. 73 at PageID 733–734.)

Epling saw Justin "four or five times," but he generally refused to meet with her. (Doc. 72 at PageID 623.) Epling asked Dr. Barton, the jail psychiatrist, to meet with Justin because she knew he had recently returned from Summit and "some of the inmates had complained about Justin acting weirder than normal." (*Id.* at PageID 625.) Although Justin initially refused Dr. Barton's request to meet, Dr. Barton met with Justin on August 15, 2016. However, Justin declined a formal assessment, and he denied having any mental health needs or needing treatment of any kind. (Barton Dep., Doc. 69 at PageID 356; Doc. 69-1 at PageID 384.) Justin specifically denied having suicidal or homicidal ideation. (Doc 69 at PageID 357.) In fact, Justin tried to convince Dr. Barton that he "had the wrong inmate." (Doc. 72 at PageID 624.) Dr. Barton's notes of the meeting indicate, "At this time there are no further treatment or evaluation needs identified." (Doc. 69-1 at PageID 384.)

On August 17, 2016, Judge Peeler tentatively approved a plan for Justin to be released to live with his uncle with outplacement treatment with Solutions. (Doc. 84-2 at PageID 1520.) On August 22, 2016, Justin's uncle agreed that Justin could live with him. (*Id.*) Also on August 22, 2016, Epling did an administrative segregation check on Justin. (Doc. 72-1 at PageID 680.) She noted "No Further Action Needed." (*Id.*)

As Justin's probation officer was on leave as of August 22, 2016, it was decided that the hearing approving Justin's release to his uncle's home would be scheduled once she returned. (Doc. 84-2 at PageID 1526.) On August 29, 2016, Justin called his parents and his uncle and told them he loved them. (Doc. 80 at PageID 1299; Osswald Dep., Doc. 78 at PageID 1143.)

8

During the call with Justin's uncle, he told Justin that there was a tentative plan in place for Justin to live with the uncle "as soon as you get out." (Doc. 78 at PageID 1147.)

On August 30, 2016, Justin hung himself in his cell with his bed sheet. (Doc. 73 at PageID 750; Doc. 71 at PageID 555–58.) Justin had not previously attempted to harm himself. (Doc. 79 at PageID 1231–33.) Although Justin's mother believed Justin was depressed and anxious the last few days of August 2016, she did not have reason to believe he might engage in self-harm. (*Id.* at PageID at 1241–42.) Justin never told his uncle he considered harming himself. (Doc. 78 at PageID 1155.)

### B. Procedural Posture

Bonita Stewart, Justin's mother and the Administratrix of his estate, initiated this action against the Warren County Board of Commissioners, the Warren County Sheriff, the medical providers for the Warren County Jail, various corrections officers, Solutions, Epling,[4] and Randol. Plaintiff voluntarily dismissed the claims against all defendants except Solutions, Epling, and Randol. (Docs. 14, 34, 48, 56.) Stewart alleges a federal claim pursuant to 42 U.S.C. § 1983 for violation of constitutional rights under color of state law as well as state law claims for wrongful death, negligence, and malpractice. Defendants Solutions, Epling, and Randol now move for summary judgment. (Doc. 83). Plaintiff opposes the Defendants' motion. (Doc. 86.)

## II. APPLICABLE LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is

---

[4] Jenny Epling is sometimes referred to inadvertently as "Jenny Epley" in the Complaint and other pleadings.

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III. ANALYSIS

### A. Federal Claim Pursuant to 42 U.S.C. § 1983

Section 1983 provides a civil avenue of redress for those deprived of federal rights by state actors. 42 U.S.C. § 1983. To prevail on a § 1983 claim, "a plaintiff must prove '(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.'" *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Shadrick v. Hopkins County*, 805 F.3d 724, 736 (6th Cir. 2015)). "[P]rivate medical professionals who provide healthcare services to inmates at a county jail qualify as government officials acting under the color of state law for the purposes of § 1983." *Id.*; *see also Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008).

The Eighth Amendment's constitutional ban on cruel and unusual punishment "generally provides the basis to assert a § 1983 claim of deliberate indifference to serious medical needs" for convicted inmates.[5] *Winkler*, 893 F.3d at 890. The right to medical care for serious medical needs includes psychological needs. *Perez v. Oakland County*, 466 F.3d 416 (6th Cir. 2006). "However, the Eighth Amendment prohibits mistreatment only if it is tantamount to 'punishment,' and thus courts have imposed liability upon prison officials only where they are 'so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain.'" *Id.* at 423 (quoting *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994)).

To demonstrate "deliberate indifference," a plaintiff must establish two components: one objective and one subjective. *Winkler*, 893 F.3d at 890; *Shadrick v. Hopkins County*, 805 F.3d

---

[5] For pre-trial detainees, "the Due Process Clause of the Fourteenth Amendment is the proper starting point." *Winkler*, 893 F.3d at 890.

724, 737 (6th Cir. 2015); *Perez*, 466 F.3d at 423. "For the objective component, the detainee must demonstrate the existence of a sufficiently serious medical need." *Winkler*, 893 F.3d at 890 (quoting *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009)). "For the subjective component, the detainee must demonstrate that the defendant possessed a sufficiently culpable state of mind in denying medical care." *Id.* at 891 (quoting *Spears*, 589 F.3d at 254). "The subjective requirement is designed 'to prevent the constitutionalization of medical malpractice claims.'" *Id.* (quoting *Rouster v. County of Saginaw*, 749 F.3d 437, 446–47 (6th Cir. 2014)). Thus, a defendant has the required culpable state of mind only if he both "knows of and disregards an excessive risk to inmate health or safety." *Id.* (quoting *Farmer v. Brennan* 511 U.S. 825, 837 (1994)). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Perez*, 466 F.3d at 424 (quoting *Farmer*, 511 U.S. at 838). A plaintiff must address the deliberate indifference standard's subjective component for each defendant individually. *Winkler*, 893 F.3d at 891.

In this case, the Court concludes, viewing the record in the light most favorable to Plaintiff, that Stewart has satisfied the objective component. Justin suffered sufficiently serious psychological needs that ultimately led to his death by suicide. Therefore, the Court will address the deliberate indifference subjective component for each defendant individually.

### 1. Jenny Epling and Jon Randol

In cases involving prison suicide, plaintiffs must show that the prison mental health workers "must have known of, and yet disregarded, an excessive risk to inmate health or safety." *Perez*, 466 F.3d at 424. In the case at bar, Plaintiff admittedly offers no evidence that Epling or Randol knew Justin was at excessive risk of harming himself. Instead, Plaintiff contends that

12

Epling and Randol "buried their heads in the sand when it came to Justin and deliberately chose to learn nothing about him or his mental condition." (Doc. 86 at PageID 1569.) Even if this allegation were factually correct (and the Court makes no finding that it is), it would only satisfy the subjective component if—viewing the record in the light most favorable to Plaintiff—a reasonable factfinder could "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Winkler*, 893 F.3d at 891 (quoting *Farmer*, 511 U.S. at 842).

In this case, however, the risk was far from obvious. Records indicate that Justin refused his food tray[6] once—eleven days before his suicide—and he "declines recreation most of the time." (Shift Log, Doc. 71-1 at PageID 579.) However, the same Shift Log suggests that other inmates occasionally refuse food trays[7] without raising concern. (Doc. 71-1 at PageID 576 (on 8/22/16, "Inmate Ritchie refused breakfast").) In addition, while Justin may have refused recreation, he requested—and was granted—time out of his cell on August 29, 2016 to "place a legal call" and "to EA." (Doc. 71-1 at PageID 579.) Thus, while Justin's behavior may generally have been concerning in the days before his death, it was not so unusual as to make obvious a significant risk that he was a danger to himself.

In addition, Plaintiff admits that Justin had not previously engaged in self-harm or attempted suicide and that, even though Justin spoke with his family both the day before and hours before his death, his family members did not believe Justin was suicidal or at risk for

---

[6] Plaintiff alleges that Justin refused his food tray on August 19, 2016. (Doc. 86 at PageID 1558 and 1570.) However, the copy of the Shift Log Report filed with the Court as part of Doc. 71-1 appears to be missing the log page relevant to August 19, 2016. (*See* Doc. 71-1 at PageID 573–79.) For purposes of this Order, the Court will assume that a full copy of the Shift Log Report would, in fact, indicate that Justin refused his food tray on August 19, 2016.

[7] Jail policy required placing an inmate on suicide watch if he declined food for three days. (Doc. 72 at PageID 618.)

harming himself. (Doc. 86-1 at PageID 1579, ¶¶ 16–18.) Justin once told his father that, "if they ever send me back to Summit, I'll kill myself." (J. Stewart Dep., Doc. 80 at PageID 1299.) However, other than that one statement, Justin never threatened suicide to his father's knowledge. (*Id.* at PageID 1299–1300.) His mother, his brother, and his uncle all testified that Justin never threatened to commit suicide. (B. Stewart Dep., Doc. 82 at PageID 1405; Z. Stewart Dep., Doc. 77 at PageID 1091–92; Osswald Dep. Doc. 78 at PageID 1155.) In fact, although Justin was asked repeatedly, he absolutely denied any suicidal ideation. (Barton Dep., Doc. 69 at PageID 357; Summit Discharge Summary, Doc. 70-1 at PageID 492; Chamberlain Email, Doc. 70-1 at PageID 498; Kurzhals Report, Doc. 73-1 at PageID 786.) Justin denied that he needed or wanted mental health treatment of any kind. (Epling Dep., Doc. 72 at PageID 623–24; Randol Dep., Doc. 73 at PageID 739–40; Barton Dep., Doc. 69 at PageID 356; Moore Letter, Doc. 71-2 at PageID 490; Summit Discharge Summary, Doc. 70-1 at PageID 492; Kurzhals Report, Doc. 73-1 at PageID 783, 789, 793.) On July 6, 2016—approximately seven weeks before Justin's death—Dr. Marciani issued a thorough, sixteen-page report of Justin's mental health status. (Doc. 73-1 at PageID 795–810.) In it, Dr. Marciani recommends hospitalization due to "the potential threat of harm he poses to others" but recognizes his prognosis as "guarded at best" because Justin "is expected to continue to be a reluctant, if not unwilling, participant in treatment." (*Id.* at PageID 809.) Dr. Marciani never concludes nor even implies that Justin is at risk for suicide or self-harm of any kind.

Accordingly, the Court concludes that no reasonable factfinder viewing the record in the light most favorable to Plaintiff could conclude that Epling or Randol must have known of, and yet disregarded, an excessive risk to Justin's health or safety. Therefore, Defendants' Motion for Summary Judgment must be granted as to Plaintiff's § 1983 claim against Epling and Randol.

## 2. Solutions

Plaintiff alleges that Solutions failed to adequately train and supervise the mental health staff it placed at the Warren County Jail, thereby constituting deliberate indifference to Justin's serious medical needs. As discussed above, the deliberate indifference standard's subjective element requires proof that the defendant possessed a culpable state of mind. In failure to train cases, the culpable state of mind can be established in one of two ways: (1) "'[a] pattern of similar constitutional violations by untrained employees' and [defendant's] 'continued adherence to an approach that [it] knows or should know has failed to prevent tortious conduct by employees;'"[8] or (2) "'a single violation of federal rights, accompanied by a showing that [defendant] has failed to train its employees to handle recurring situations presenting an obvious potential' for a constitutional violation." *Shadrick v. Hopkins County*, 805 F.3d 724, 739 (6th Cir. 2015) (quoting *Bd. Of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 and 409 (1997)). "This second mode of proof is available 'in a narrow range of circumstances' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.'" *Id.* (quoting *Bryan County*, 520 U.S. at 409). To prevail under a recurring situations failure to train theory, a plaintiff "must demonstrate that the training was 'inadequate for the tasks the [employees] were required to perform, the inadequacy resulted from [the defendant's] deliberate indifference, and the inadequacy actually caused, or is closely related to, [his] injury.'" *North v. Cuyahoga County*, 754 F.App'x 380, 392–93 (6th Cir. 2018) (quoting *Shadrick*, 805 F.3d at 738)).

---

[8] Plaintiff in this case does not allege a pattern of similar constitutional violations by untrained employees. Indeed, the record contains no evidence of prior suicides by Warren County inmates during the time Solutions provided mental health services to support such a claim.

The case at bar has little in common with the *Shadrick* case on which Plaintiff relies. In *Shadrick*, the inmate suffered from an infection that ultimately caused sepsis and death. Upon arrival to prison, the inmate in *Shadrick* informed a deputy sheriff that he had an MRSA infection and was under a doctor's care for high blood pressure, rheumatoid arthritis, gout, and osteoporosis. *Shadrick*, 805 F.3d at 729. Indeed, the deputy did not want even to admit the inmate to the jail "due to his condition." *Id.* The inmate in *Shadrick* was vomiting, suffering from a staph infection as well as a second rash that had not been diagnosed, had clammy skin, was bloated, and "was almost gray in color." *Id.* at 729–30. Shortly thereafter, his joints became swollen and hot to touch; he was in too much pain to move; and he lost control of his bowels. *Id.* at 731–32. With regard to causation, the Court in *Shadrick* stated, "The undisputed facts establish that [the inmate's] urgent need for medical treatment was apparent the moment he walked through [the jail's] door, yet [medical] staff did not provide it in spite of [the inmate's] requests for help and the urging of jail deputies to attend to [him]." 805 F.3d at 744. With regard to training, the Licensed Practical Nurse on duty testified she did not participate in any training prior to her employment as a visiting nurse, received only limited "on-the-job training" from a regional administrator, could not recall if she had received copies of any policies and procedures, had never met the doctor who supervised her nor spoken to him by telephone, and she did not receive an evaluation during the eighteen months she worked for the contracting agency. *Id.* at 734.

In the case at bar, Epling earned a Bachelor of Science in criminal justice and a master's degree in counseling. (Doc. 72 at PageID 587–88.) She is a Licensed Professional Counselor ("LPC") and a Licensed Independent Chemical Dependency Counselor ("LICDC"). (*Id.* at PageID 588.) To prepare her to be a boundary spanner, she received health officer training,

training in documentation in electronic health record systems, and shadowed a supervisor until she learned the role. (Dern Dep., Doc. 74 at PageID 847; Doc. 72 at PageID 595–96.) She also learned the process and criteria for committing an inmate to an involuntary 72-hour hold (called a "pink slip"). (Doc. 72 at PageID 655–56.)

Randol supervised Epling's work. (Doc. 72 at PageID 660.) He signed off on Epling's 12-day assessments and notes. (*Id.* at PageID 661–63.) Randol and Epling met every Wednesday with jail administrators and medical personnel to review any updates on inmates. (Doc. 73 at PageID 720, 724, 732; Doc. 72 at PageID 662.) Solutions supervisors received copies of Epling's administrative segregation checks, although she did not know who, if anyone, reviewed them. (Doc. 72 at PageID 665–66.) Randol completed performance reviews for Epling which were also reviewed by Randol's supervisor, Angela Johnsen.[9] (Doc. 74 at PageID 853.) Epling's first performance review occurred after her initial 90-day period of employment. (*Id.*) The performance reviews included suggestions for additional training and professional development. (Doc. 74 at PageID 854.) In addition, to maintain her state licensure, Epling was required to complete and report continuing education courses. (*Id.* at PageID 856.)

Thus, the Court agrees with Plaintiff that there are cases (like *Shadrick*) where the failure to train employees to handle recurring situations is so egregious as to demonstrate the culpable mind required for subjective deliberate indifference to serious medical needs. However, the Court concludes that this is not one of those cases. Although this case is tragic, the record does not raise a genuine issue of material fact that Defendants were deliberately indifferent to Justin's serious mental health needs.

---

[9] Angela Johnsen and then Michelle Box supervised Randol. (*Id.* at PageID 846.) Dr. Dern, in turn, supervised Johnsen and Box. (Doc. 74 at PageID 846–47.)

Furthermore, even if the Plaintiff could prove that Solutions' training program and supervision were inadequate for the tasks Epling and Randol were required to perform and the inadequacy resulted from Solutions' deliberate indifference, the Plaintiff would still have to offer evidence that "the inadequacy actually caused, or is closely related to," Justin's death. *Shadrick*, 805 F.3d at 738. Plaintiff is unable to do so.

The undisputed facts of this case indicate that everyone tried to provide Justin with mental health treatment, except Justin himself. Mental illness can be exceedingly difficult to treat effectively because the diagnosis and treatment of such illnesses rely at least in part on the cooperation and participation of the very person who is mentally ill and may not fully understand the issues that others identify. In the 90-day period prior to Justin's death by suicide Justin was: (1) sent to Summit for a 20-day inpatient stay; (2) evaluated by Dr. Marciani; (3) subjected to attempted 12-day mental health assessments by both Epling and Randol; (4) offered mental health treatment in weekly[10] administrative segregation checks: (5) given access to a Kiosk by which he could have requested mental health treatment at any time: (6) seen by Dr. Barton at Epling's request; and (7) having ongoing outpatient mental health treatment arranged for him because locked inpatient treatment was unavailable. While Justin's mental health records indicate concerns about his treatment of others, at no time did any of these mental health providers, jail personnel, court personnel, or even loving family members believe Justin was in danger of hurting himself. Prior to his suicide, Justin had not engaged in self-harm and had repeatedly denied contemplating suicide. The Defendants in this case were not deliberately

---

[10] The last administrative segregation check Epling provided to Justin was eight days before his death. Although the checks were to be done weekly per jail policy (Doc. 72 at PageID 609–10; Doc. 73 at PageID 744–34), a policy violation or even medical malpractice cannot sustain a § 1983 claim for an alleged violation of the Eighth Amendment absent a showing of deliberate indifference. *Perez*, 466 F.3d at 423.

indifferent to Justin's mental health needs. They were simply ineffective in diagnosing and treating Justin's illness, at least in part because Justin repeatedly denied that he had an illness and regularly refused treatment. Although the Court sympathizes with Plaintiff, the facts here do not support a finding of cruel and unusual punishment.

## B. State Law Claims

In addition to the § 1983 claim, Plaintiff alleges state law claims for wrongful death, negligence, and malpractice against the remaining Defendants. (Second Amended Complaint, Doc. 39 at the Second, Sixth, and Seventh Causes of Action.) Defendants contend that they are statutorily immune from these claims under Ohio Revised Code § 2305.51(B). However, the application of § 2305.51 immunity where the client injures himself (as opposed to a third party) is not well-settled under Ohio law. *See Johnson v. Patel*, 2008-Ohio-596, 2008 WL 399022 (Ohio Ct. App. 2008) (mentioning § 2305.51, but finding immunity under a state statute inapplicable here).

When a Court has dismissed the federal claims in a case, it may, in its discretion, decline to exercise supplemental jurisdiction over the pendent state law claims. *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514 (2006); *Landefeld v. Marion Gen. Hosp., Inc.,* 994 F.2d 1178, 1182 (6th Cir. 1993). "The court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld,* 994 F.2d at 1182 (citing *Aschinger v. Columbus Showcase Co.,* 934 F.2d 1402, 1412 (6th Cir. 1991)). Because the application of Ohio Revised Code § 2305.51 immunity to cases involving suicide is not well-settled under Ohio law and because Defendants are entitled to summary judgment on the § 1983 claim—the only claim over which this Court has original

jurisdiction—the Court declines to exercise supplemental jurisdiction over the state claims. 28 U.S.C. § 1367(c)(1) and (3).

**IV.     CONCLUSION**

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Doc. 83) is hereby **GRANTED** on Plaintiff's § 1983 claim.  The Court declines to exercise supplemental jurisdiction over Plaintiff's claims under Ohio law, and those claims are hereby **DISMISSED WITHOUT PREJUDICE**.  This matter shall be terminated from the Court's docket.

**IT IS SO ORDERED**.

Dated:  9/4/2019                                S/Susan J. Dlott_____
                                                                             Judge Susan J. Dlott
                                                                             United States District Court